UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

N.R.R., by and through RYANN              )
DAVENPORT, as next friend,                )
                                          )
            Plaintiff,                    )
                                          )
     vs.                                  )          Case No. 4:12CV54 CDP
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
            Defendant.                    )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying plaintiff N.R.R.'s application for child's

supplemental security income.  Plaintiff's mother, Ryann[1] Davenport, brings this

action on behalf of her son, claiming that he is disabled because of attention deficit

hyperactivity disorder and learning difficulties.  The Administrative Law Judge

concluded that N.R.R. was not disabled.  Because I find that the overall decision

denying benefits was supported by substantial evidence, I will affirm.

## Procedural History

On October 29, 2008, Davenport applied for child's supplemental security

income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et*

_____

[1] The various records alternatively spell Davenport's first name as "Ryan" and "Ryann."  It is
unclear which is correct, but I have used the latter spelling because that is the spelling used in
plaintiff's complaint.

*seq.*, on her son's behalf.  The Social Security Administration denied the claims, and Davenport filed a timely hearing request.  Davenport appeared and testified at a hearing held on April 22, 2010.  The Administrative Law Judge issued an opinion on June 24, 2010, upholding the denial of benefits.  Davenport requested review by the Appeals Council for the Social Security Administration, and on November 23, 2011, the Council denied Davenport's request.  The ALJ's determination thus stands as the final determination of the Commissioner.

## Evidence Before the ALJ

### *Testimony of Claimant's Mother*

Plaintiff's mother, Davenport, testified before the ALJ on April 22, 2010. Plaintiff did not testify at the hearing.  Davenport testified that her son was ten years old and in fourth grade at the time of the hearing.  She testified that she had two other children, both girls, aged three months and eleven years at the time of the hearing. Davenport was unmarried and lived and cared for the three children on her own.

N.R.R. was diagnosed with attention deficit hyperactivity disorder.  Davenport testified that N.R.R.'s school day was split between regular and special education classes.  Davenport testified that the special education classes had three to five children, and two teachers.  The special education classes provided an opportunity for the teachers to help the students with their general education assignments in a one-on-one environment.  Davenport testified that she talked to N.R.R.'s teachers once or

twice a week when she went to the school, and otherwise on an as-needed basis.

Davenport testified that N.R.R.'s split between general and special education classes did not seem to help his behavior or his learning. She said that he showed disrespect, had a lack of communication with the teachers, and bothered the other children. Regarding his academic abilities, Davenport testified that N.R.R.'s reading and writing skills were either at or just below grade level, and that his mathematics skills were just below level.

The ALJ asked Davenport about the school personnel who had filled out reports regarding N.R.R. Davenport testified that Ms. Adams was the school counselor, and knew N.R.R. because he was sent to her when he misbehaved. N.R.R. would talk to Ms. Adams, and sometimes completed his work in her office. Davenport indicated that Tiffany Jones was one of N.R.R.'s current general education teachers, and saw N.R.R. for maybe ninety minutes daily. Davenport testified that Wendy Stocker was a general education teacher of N.R.R.'s from the previous year.

Davenport further testified that N.R.R. was seeing Gerry Deschamps, M.D., who had been N.R.R's doctor since birth. Davenport believed that N.R.R. visited Dr. Deschamps every three months or so. At Dr. Deschamps' direction, N.R.R. was taking Daytrana for his ADHD. Davenport testified that the medication seemed to work for a couple weeks but then N.R.R. "got immune" to it and it stopped working. She testified that N.R.R. had previously taken Adderrall, but that also stopped

working with time.

Davenport testified that N.R.R. was not very good at acquiring and using information, and that he constantly had to be told to do the same thing. She also stated that he refused to do chores when requested, but that it was because of his inability to concentrate rather than purposeful misbehaving. Davenport testified that N.R.R. could not concentrate on anything for two hours straight, including watching a movie. She noted that N.R.R. tried karate but could not follow instructions, and was kicked out of after-school summer programs and church programs because of his behavior. Davenport testified that N.R.R. would fight with or bother other children, sometimes becoming violent, and that he would not listen to adults including his own grandmother. She also testified that he bit his clothes, and would sometimes wander off on his own.

Davenport testified that N.R.R.'s problems made it difficult for her to attend to her other children since he required so much extra attention. He fought with his older sister, and Davenport was scared to let him around her baby.

### *School Records*

On November 21, 2008, a teacher questionnaire was completed by N.R.R.'s general education teachers, Amanda Bush and Wendy Stocker. They indicated that they had known N.R.R. for four months, and saw him in class for several hours each day. They reported that N.R.R. had problems in acquiring and using information, and

attributed the issues to a lack of focus.  In particular, they noted obvious problems in comprehending and following oral instructions and understanding and participating in class discussions.  They marked N.R.R. as having serious or very serious problems in almost every facet of attending and completing tasks.  Serious problems were also noted in regard to N.R.R.'s ability to interact and relate with others, and they indicated that they had tried multiple behavior modification strategies.  Some problems were also noted as to N.R.R.'s ability to care for himself, particularly in appropriately handling patience and frustration.  Ms. Bush and Ms. Stocker indicated no problems as to N.R.R.'s ability to move about and manipulate objects.  Ms. Stocker completed another school activities questionnaire on February 28, 2009.  Her responses again noted marked or extreme limitations in attending and completing tasks, and interacting and relating with others.

Ms. Bush and Ms. Stocker completed another questionnaire on January 9, 2009.  They indicated that N.R.R. was easily distracted, had many issues with interpersonal skills, and had daily or hourly occurrences of disruptive, impulsive, or inappropriate behavior.

On April 3, 2009, a diagnostic report was compiled in preparation for N.R.R.'s upcoming individualized education program meeting.  The report reflected the school's concerns over N.R.R.'s abilities in reading, math, written expression, and task related behaviors.  Teacher questionnaires referenced in the report noted

N.R.R.'s difficulties managing his behavior and emotions, planning and organizing, and inhibiting impulsive responses. School psychological examiner Bruce Gamble observed N.R.R. in class, and noted that he had difficulty monitoring his own behavior and sustaining attention to the task at hand. In a progress report for the 2008-2009 school year, Ms. Bush noted that N.R.R.'s behavior had improved from the first quarter, although he still struggled to stay focused on the task at hand.

N.R.R. had his initial IEP meeting on April 24, 2009. Participants at the IEP meeting included N.R.R.'s father; N.R.R's teachers, Ms. Bush and Ms. Stocker; school counselor Ms. Adams; assistant principal Ms. Turner; and special education teacher Ms. Taylor. The IEP noted N.R.R's diagnosis of Other Health Impaired and ADHD, with limitations to his rate of processing, weak grammar, poor time management and organization, poor participation, and poor organization of lengthy written work. The IEP also noted that N.R.R.'s grades consisted of one A, one B plus, four Cs, and one D. Although the IEP did not contain a behavior intervention plan, it noted that N.R.R.'s behavior needed monitoring. His IEP goals included increasing his time on task and increasing his social skills. The IEP also called for N.R.R. to be placed inside a regular class at least 80 percent of the time.

On May 29, 2009, a progress report indicated N.R.R. was making progress on both of his goals with 40 percent accuracy. On November 24, 2009, N.R.R. was involved in a fight with another student and suspended for three days.

On December 4, 2009, Ms. Jones completed a school activities questionnaire for N.R.R. She indicated that she was N.R.R.'s general education teacher and had known him since August. Ms. Jones indicated that N.R.R. had some moderate and a few marked limitations in acquiring and using information, marked and extreme limitations in both attending and completing tasks and interacting and relating with others, and few or no limitations in moving about and manipulating objects and caring for self. She remarked that his impulsivity and behavior greatly impacted the classroom environment, and that he required redirection or intervention to successfully complete tasks.

On December 8, 2009, Chrissie Messina also submitted a school activities questionnaire. She indicated that she was N.R.R.'s classroom teacher and had known him for two months. Ms. Messina noted marked or extreme limitations in all areas of functioning except for moving about and manipulating objects. She also reported that N.R.R. had a difficult time controlling his behavior and anger.

An IEP meeting was held for N.R.R. on April 16, 2010. At the time of the meeting, N.R.R.'s grades consisted of one A, four Bs, one C, and one D. As to N.R.R.'s goal of increasing his time on task by completing given assignments with prompts in a structured setting 3/5 days with 75 percent accuracy, it was noted that he was currently at 60 percent. In regard to his goal of decreasing inappropriate behavior during independent time to 65 percent with no more than two prompts, it

was noted that N.R.R. was only at 5 percent.

Another IEP meeting was held for N.R.R. on April 18, 2011. At the time of the meeting, N.R.R.'s grades consisted of four Cs and two Ds. The IEP report noted that N.R.R.'s goals of increasing his time on task and decreasing inappropriate behavior were not met, and that he would benefit from a behavior chart to help monitor his behavior. It was concluded at the meeting that N.R.R. was not able to comply with adult directions and had difficulty with peer relationships, and his service minutes were increased from 150 to 300.

## *Medical Records*

On October 21, 2005, Davenport took N.R.R. to Dr. Deschamps because he could not sit still and was having behavior problems in school. Davenport told Dr. Deschamps that N.R.R. did well with school-work but could not follow directions and needed redirection while in class. On October 25, 2005, Dr. Deschamps diagnosed N.R.R. with ADHD and prescribed Concerta. The following week, on November 2, 2005, Dr. Deschamps doubled N.R.R.'s dosage of Concerta. Davenport reported on November 9, 2005, that N.R.R. was doing better on the increased dosage and was able to concentrate on his homework.

On December 12, 2005, N.R.R. was examined by a psychologist, Joan Nicholson. Ms. Nicholson described N.R.R. as restless and indicated that he needed to be redirected multiple times before completing assigned tasks. She suspected

learning delays, and noted that his behavior interfered with his learning progress. Ms. Nicholson noted diagnoses of ADD, probable personality disorder, and impaired social and educational functioning.

On October 29, 2008, Dr. Deschamps noted that N.R.R. was not doing well and that his behavior and attitude were worsening. He switched N.R.R.'s medication to Daytrana. On January 12, 2009, Dr. Deschamps noted that N.R.R. was doing well on Daytrana, and was at an adequate dosage.

On January 21, 2009, Martin Rosso, Ph.D., conducted an evaluation of N.R.R. that included a clinical interview and the Wechsler Intelligence Scale for Children-IV. Dr. Rosso reported that N.R.R. was polite and his social behaviors were normal, although he tended to act impulsively. N.R.R. told Dr. Rosso that he was taking medication for his behavior and the medication helped him feel calm and do better in school. According to the WISC-IV, N.R.R. had a full scale IQ of 82. Dr. Rosso concluded that N.R.R. had low average cognitive ability, and that his behavior and test results were consistent with a diagnosis of ADHD.

On December 16, 2009, N.R.R. was examined by Robert Schlitt, Ph.D. Davenport and N.R.R. both reported to Dr. Schlitt that N.R.R. often lost his temper, would argue with adults, was easily bored and distracted, and had difficulty organizing his work. Dr. Schlitt noted that N.R.R. was hyper and had difficulty sitting still. Dr. Schlitt administered the WISC-IV, which revealed a full scale IQ of

76. The test also showed weaknesses in visual abstract reasoning, visual information processing, and vocabulary. Dr. Schlitt completed a questionnaire, indicating that N.R.R. had some marked limitations in acquiring and using information and caring for self, marked and extreme limitations in attending and completing tasks and interacting and relating with others, and few limitations in moving about and manipulating objects.

On February 3, 2010, Dr. Deschamps noted that N.R.R. was not taking his Daytrana, but that Davenport reported that she was not interested in restarting the medication and that N.R.R. was doing fine at school.

## Legal Standard

Title 42 U.S.C. § 1382c(a)(3)(C)(I) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence. *Rucker v. Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998); *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998); *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might

accept it as adequate to support a decision." *Cox v. Apfel*, 160 F.3d 1203, 1206-07

(8th Cir. 1998). To determine whether the decision is supported by substantial

evidence, the court is required to review the administrative record as a whole to

consider:

> (1)  the credibility findings made by the ALJ;
>
> (2)  the education, background, work history, and age of the claimant;
>
> (3)  the medical evidence given by claimant's treating physicians;
>
> (4)  the subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5)  the corroboration by third parties of the claimant's physical impairment;
>
> (6)  the testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7)  the testimony of consulting physicians.

*Brand v. Sec'y of Dept' of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir.

1980). When reviewing the record to determine whether the Commissioner's

decision is supported by substantial evidence, however, the court must also take into

account evidence in the record that fairly detracts from that decision. *Warburton v.*

*Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *Baker v. Apfel*, 159 F.3d 1140, 1144 (8th

Cir. 1998); *Bryant v. Apfel*, 141 F.3d 1249, 1250 (8th Cir. 1998). The court may not

reverse the decision merely because substantial evidence would also support an

opposite conclusion.  *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999); *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998).  *See also Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (internal quotations omitted)).

Under the Act, the ALJ inquires first into whether the child is currently engaged in substantial gainful activity and next into whether the child has an impairment or a combination of impairments that is severe.  *Walker v. Apfel*, 141 F.3d 852, 854 (8th Cir. 1998); *Bryant*, 141 F.3d at 1251.  If the ALJ finds at step two of the evaluation that a child's impairments are severe, as in the instant case, then the question at step three is whether those severe impairments meet or medically equal the severity of a set of criteria for an impairment listed in the regulations, or are functionally equivalent to the listings.  20 C.F.R. § 416.924(a) (2008); 20 C.F.R. pt. 404, subpt. P, app. 1, pt. B.  *See also Walker*, 141 F.3d at 854 (finding last step of evaluation process to be whether the impairment or combination if impairments is of comparable severity to impairments that would disable an adult).  To determine functional equivalence, the ALJ must decide whether the impairments cause "marked and severe functional limitations" and whether they meet the duration requirement of at least one year.  *Walker*, 141 F.3d at 854; 20 C.F.R. § 416.924(d).  To determine functional equivalence, the Commissioner considers the child's functioning in six

areas or domains.  20 C.F.R. § 416.926a(b)(1).  Those domains are: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself; and 6) health and physical well-being.  *Id*.

A child's impairments will be found to "functionally equal" the impairments listed in the regulations if they cause the child to have "marked" limitations in at least two of the domains or an "extreme" limitation in at least one domain.  20 C.F.R. § 416.926a(d).  A child has a "marked" limitation in one of these domains when his or her "impairment(s) interferes seriously with his ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i); *see also Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 651 (8th Cir. 2004) (quoting § 416.926a).  Likewise, a child has an "extreme" limitation when his or her "impairment(s) interferes very seriously with his ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3).  There may be "marked" or "extreme" limitations in only one activity or in several activities as a result of the interactive and cumulative effects of the child's impairments.  20 C.F.R. § 416.926a(e)(2)–(3).

To determine whether the child is experiencing "marked" or "extreme" limitations in the domains, the ALJ must review all the evidence in the record and compare the child's functioning to "the typical functioning of children [the child's] age who do not have impairments."  20 C.F.R. § 416.926a(f)(1).  *See also* 20 C.F.R. §

416.924a(b)(5)(ii); 20 C.F.R. § 416.926a(b).  The ALJ considers "the effects of structured or supportive settings," how the child functions in school, and the effects of the child's medications, if any.  20 C.F.R. § 416.926a(a)(1)–(3).  Finally, in determining a child's disability, the Commissioner must consider all relevant evidence, which may include medical evidence and information from people who know the child – such as parents and teachers – and can provide evidence about his functioning.  20 C.F.R. § 416.924a(a).

## ALJ's Findings

The ALJ found that plaintiff was not disabled, issuing the following specific findings:

1.    The claimant was born on October 5, 1999.  Therefore, he was a school-age child on October 29, 2008, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.    Obviously, at his age, the claimant has not engaged in substantial gainful activity since October 29, 2008, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairment:  attention-deficit hyperactivity disorder.  (20 CFR 416.924(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.    The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926(a)).

6.    The claimant has not been disabled, as defined in the Social Security

-14-

Act, since October 29, 2008, the date the application was filed (20 CFR 416.924(a)).

The ALJ stated that he evaluated the "whole child" in making his findings regarding functional equivalence. In concluding that N.R.R. did not have an impairment that functionally equaled the listings, the ALJ gave significant weight to the reports of Dr. Deschamps and to the findings made by the State Agency psychological consultant, Kyle DeVore, Ph.D. He gave little weight to Dr. Schlitt's assessment because Dr. Schlitt did not have a treating relationship with N.R.R. and his opinion was not consistent with the overall evidence of record. The ALJ discussed the school records, including the questionnaires completed by N.R.R.'s teachers, but gave them little weight because they were inconsistent with the treatment notes of Dr. Deschamps and because N.R.R. had not required any specialized mental health treatment or psychiatric hospitalizations.

The ALJ found that N.R.R. had no limitations in moving about and manipulating objects, or in health and physical well-being, and less than marked limitations in all remaining areas.

In the area of acquiring and using information, the ALJ noted that N.R.R. was placed in special education because of behavior, not aptitude, and his teachers indicated that any limitations were due to lack of focus rather than lack of ability. In deciding N.R.R. had less than marked limitations in attending and completing tasks, the ALJ relied on Dr. Rosso's report that N.R.R. was able to put forth effort on

assigned tasks. Additionally, N.R.R. reported feeling calm on his medications, played outside and with video games, and was able to remain in his regular classes at least 80 percent of the time.

The ALJ also found less than marked limitations in interacting and relating with others. Despite reports from N.R.R.'s teachers and mother indicating difficulties in interacting cooperatively with others, the ALJ noted that N.R.R.'s mother reported he had friends and talked with family, and that Dr. Rosso noted he was friendly and cooperative and denied problems with peer relationships. Finally, the ALJ found that N.R.R. had less than marked limitations in caring for himself. His teachers noted serious problems with handling frustration and his mother noted difficulties accepting criticism and choosing clothing. However, N.R.R. was able to button his clothes, tie his shoes, and complete personal hygiene tasks without assistance.

## Discussion

Plaintiff argues that the ALJ's findings and conclusions were not supported by substantial evidence because he failed to follow the "Whole Child" approach in evaluating N.R.R.'s claims. Specifically, plaintiff argues that the ALJ failed to fully consider the daily effects of N.R.R.'s impairments in a school setting, and failed to consider non-medical evidence including the pre-IEP comprehensive evaluation, the IEP, teacher evaluations, and school records.

The ALJ discussed the teacher questionnaires, IEP, and discipline problems

noted in the record, and the fact that Social Security Ruling 06-3p indicates that professionals such as teachers are good sources of information. He acknowledged that N.R.R. was suspended for fighting, required an IEP, and that his teachers noted "numerous extreme and very serious problems." However, the ALJ assigned minimal weight to this evidence because he found it to be inconsistent with the treatment notes of Dr. Deschamps and the fact that N.R.R. required no specialized mental health treatment or psychiatric hospitalizations. In discounting the school evidence, the ALJ further noted that although N.R.R. at times required medications, he was doing "fine" without them and was able to remain in his regular classroom at least 80 percent of the time.

Plaintiff argues that this discussion of the school evidence was too "brief and vague" to satisfy the "Whole Child" analysis. However, there is no requirement that this particular evidence be discussed with any set amount of detail. In fact, an ALJ's failure to cite specific evidence altogether is not necessarily indicative of whether it was considered. *See England v. Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Here, not only did the ALJ cite the school evidence, he provided his reasons for the weight he assigned it.

When adequately explained and supported, credibility determinations are for the ALJ to make, *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000), and an ALJ is not required to credit assessments by teachers over assessments by treating doctors. *See*

*England v. Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007). It is proper for an ALJ to

consider whether a claimant's impairments can be treated with medication when

determining whether a claimant has an impairment in a functional equivalence

domain. *See* 20 C.F.R. § 416.926a(a)(3); 20 CFR § 416.924a(b)(9)(i)(D)-(E) (stating

that the Commissioner will consider "changes in [a child's] medication or the way

[the child's] medication is prescribed; and [a]ny evidence over time of how

medication helps or does not help [the child] to function compared to other children

your age who do not have impairments") ; *Collins ex rel. Williams v. Barnhart*, 335

F.3d 726, 729-30 (8th Cir. 2002) (finding that denial of benefits is supported when a

child's hyperactivity can be controlled through properly administered medication).

Furthermore, a treating physician's opinion is generally given more weight than other

sources in a disability proceeding. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir.

2012) (citing 20 C.F.R. § 404.1527(c)(2)).

The ALJ did not ignore N.R.R.'s school performance, as plaintiff argues;

rather, he credited Dr. Deschamps' assessment of N.R.R.'s school performance over

that of the teachers. The ALJ cited Dr. Deschamps' report from November of 2005

that on an increased does of Concerta, N.R.R. was doing better, able to concentrate

on his homework, and that Davenport was comfortable with his progress. Similarly,

Dr. Deschamps reported that in January of 2009, N.R.R. was continuing treatment

with Daytrana and "doing well." In February of 2010, Dr. Deschamps noted that

even though N.R.R. had stopped taking Daytrana, he was still "doing fine at school," and Davenport was uninterested in restarting the medication.

The ALJ also relied on the findings of Dr. Rosso, a consultative examiner. The ALJ cited Dr. Rosso's report that N.R.R. had normal social behaviors, and that N.R.R. reported that his medications helped keep him calm, that he had friends at school with no significant peer relation problems, and that after school he played outside or played video games. Dr. Rosso assigned a GAF of of 65, indicating mild symptoms. Plaintiff argues that, "Accepting the observation of the child's behavior or performance in an unusual setting, like a [consultative examination], without considering the rest of the evidence could lead to an erroneous conclusion about the child's overall functioning." SSR 09-2p. However, the ALJ's findings make it clear that he did not rely solely on Dr. Rosso's report, but considered it in light of the rest of the evidence.

The ALJ also gave significant weight to the opinion of the State Agency psychological consultant, Kyle DeVore, Ph.D. Findings of fact made by State Agency medical consultants and other program physicians regarding the nature and severity of an individual's impairments must be treated as expert opinion evidence of nonexamining sources to be considered and weighed along with the medical evidence from other sources. SSR 96-6p. Dr. DeVore found that N.R.R. did not have severe impairments that met or equaled a listing. The ALJ stated that although Dr. DeVore

did not examine N.R.R., he was a specialist familiar with the regulations, provided a narrative explaining his findings, and his opinion was consistent with the overall evidence of record.

I find that the ALJ's decision was supported by substantial evidence, and that he properly used the "Whole Child" approach and considered the non-medical records. The ALJ's opinion discusses both medical and non-medical records, including the teacher reports, N.R.R.'s IEP, and other school records. The ALJ has not failed to consider this evidence; rather, he failed only to give it the weight plaintiff desired. In attempting to resolve the various conflicts and inconsistencies in the record in accordance with the applicable standards, the ALJ did "precisely what an ALJ is instructed to do." *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 666-67 (8th Cir. 2003).

Although the school records provide some evidence contrary to the ALJ's decision, this alone is insufficient to support a reversal. The court may not reverse the ALJ's decision merely because substantial evidence would also support an opposite conclusion. *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999); *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998). *See also Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (internal quotations omitted)).

I will therefore affirm the ALJ's finding that N.R.R. was not disabled within the meaning of the Social Security Act.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 15th day of March, 2013.